COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-04-069-CR

 

 

KESEY DARNELL FRANK                                                       APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

 

I.  Introduction

A jury convicted Appellant Kesey Darnell Frank of
capital murder, and the trial court sentenced him to life in prison.  In six points, Frank complains that the trial
court erred by overruling his motion to suppress, motion for an instructed
verdict, and motion for new trial; by excluding a videotape from evidence; by
admitting photographs of the deceased victim; and by making a misstatement of
law in the jury charge.  We will affirm.








II.  Factual Background

On September 15, 2002, Frank, Adalberto
Ponce-Duron, Jerry Jackson, Justin Ebert, and Stephanie Tacina met at a friend=s
apartment in the Mack Park Apartments in Denton to watch a football game.  Around halftime, Jackson and a few others
left to go to the store.  Before Jackson
left, however, he and Tacina had an argument, and a Ascuffle@
occurred in the apartment complex=s
parking lot.  Tacina suffered an injury
to her head.[1]  Jackson left for the store, leaving Tacina in
the parking lot.  

A resident of the apartments noticed Tacina
staggering and holding her head and stomach. 
The resident went to assist Tacina and after discovering a sizeable knot
on the back of Tacina=s head, the resident called 911.









Jackson and his acquaintances returned to the
apartment complex to find an ambulance, the fire department, and a police car
in the parking lot.  The police
handcuffed and questioned Jackson, Frank, and Ebert.   About this time, Amanda Doyle and Tymeshia
Turner arrived.[2]  Police ultimately arrested Jackson but
released Frank and Ebert.  Frank,
Ponce-Duron, Doyle, Turner, and Ebert, who were all present in the parking lot,
were visibly upset that Jackson had been arrested and were overheard saying
that they intended to Abeat up@ Tacina.


Frank, Ponce-Duron, Doyle, Turner, and Ebert left
the apartment complex in Doyle=s white
four-door Hyundai.  They decided to find
out which hospital Tacina had been taken to so that Doyle could beat her
up.  On the way to the hospital, they
discussed what they planned to do with Tacina after the assault. After locating
Tacina at Denton Regional Hospital, they learned that she would be released in
about an hour.  They decided to go to
Ebert=s
residence to pick up some money for marijuana and to then look for a place to
leave Tacina; Ponce-Duron remained at the hospital. 

After leaving Ebert=s
residence, the group stopped briefly at the house of one of Frank=s
relatives, and Frank retrieved a gun; the gun turned out to be fake.  The group searched for a suitable place to
leave Tacina after the assault.  They
pulled into a driveway, but deemed the location unsatisfactory, and then pulled
into a trailer park across the street. 
While at the trailer park, Ebert picked up a brick and placed it on the
floorboard of the car.[3]  The group then returned to the hospital. 








At the hospital, Doyle, Ebert, and Frank stood
behind a sign and waited for Turner to pick up Tacina and Ponce-Duron (they
thought Tacina might not enter the car if she saw Doyle), and Frank broke the
brick that Ebert had found at the trailer park into two halves.  Turner picked up Tacina and Ponce-Duron and
then pulled up where Doyle, Ebert, and Frank were waiting, allowing them to hop
into the car.  After Frank got in the
car, he struck Tacina on the head with one of the pieces of brick and then with
his fists.  Tacina screamed, but no one
responded.  As they were driving, Frank
and Ponce-Duron continued to strike Tacina, pushing her down to the
floorboard.  Doyle turned around and also
struck Tacina a few times from her position in the front passenger seat. Tacina
was bleeding from her head, and a Alarge
amount@ of
blood collected in the back seat. 








The group eventually ended up at the residence of
one of Doyle=s friends, Tasia Hoffman,
between 11:00 p.m and 12:00 a.m.  Hoffman
looked inside of Doyle=s car and saw Frank,
Ponce-Duron, Ebert, and Tacina.  Hoffman
observed that Tacina=s back was bruised, that she had
burn marks on her, and that her hair was bloody looking.  Turner said that they had beaten up Tacina
because she had caused Jackson to be arrested, and Doyle asked Hoffman if Doyle
could dump Tacina=s body in the field near Hoffman=s
home.  Hoffman=s father
appeared, however, and instructed Hoffman to come back inside her house. The
group then left.

Frank, Ponce-Duron, Doyle, Turner, and Ebert
drove around for some time before pulling into a field.  They all exited the car, and Ponce-Duron
pulled Tacina out of the car and tried to break her neck.  Frank ripped off Tacina=s shirt,
wrapped it around her neck, and also tried to break her neck.  Both were unsuccessful.  Doyle went to the car and removed a pair of
scissors from the glove compartment. 
Ponce-Duron cut Tacina=s throat
with the scissors and stabbed her in the stomach multiple times.  The group departed, leaving Tacina=s body
in the field.  

The group then drove to Doyle=s house
where Frank and Ponce-Duron showered and changed clothes.  They collected the items that had Tacina=s blood
on them and placed the items in a trash bag. 
They then went to a car wash and cleaned Doyle=s
car.  Frank and Ponce-Duron cleaned the
back seat while Doyle cleaned the front seat. 
Turner then took Frank home. 

The next morning, Ebert, Doyle, Turner, and
Ponce-Duron picked up cleaning supplies from a friend of Ebert=s and some
bleach from Turner=s house and went to Ponce-Duron=s house
where Ponce-Duron cleaned Doyle=s car
some more, removing portions of it that were blood stained.  They burned the trash bag containing the
bloody items.  








The Lewisville Police Department assigned
Detective Edward Barrett to be the lead detective on the case.  During the course of his investigation,
Detective Barrett found a piece of brick in Ponce-Duron=s back
yard and another piece of brick near the entrance of Denton Regional Hospital.
A subsequent analysis of both pieces showed that they matched; the pieces had
previously formed one brick.  The brick
piece discovered in Ponce-Duron=s back
yard contained trace evidence, including one piece of hair.  Subsequent microscopic analysis of the hair
found on the brick and a sample hair taken from Tacina=s body
established that the hair on the brick belonged to Tacina.  Blood samples taken from Doyle=s car
also matched a known sample of Tacina=s blood
taken during her autopsy.  

The medical examiner listed Tacina=s cause
of death as multiple sharp force injuries. 
Tacina=s autopsy showed that her
trachea had been incised, or cut through completely, possibly with a pair of
scissors.  She also had eleven stab
wounds to her abdomen, a burn over her left cheek, and defensive wounds. 

III.  Motion for New Trial








Frank filed a motion for new trial.  In a single sentence, he alleged, ANewly
discovered evidence has been obtained concerning the lack of truthfulness of a
key State witness, namely Justin Ebert.@  Frank attached the affidavit of Omari
McKinley to his motion for new trial. 
McKinley=s affidavit is two paragraphs
and states that he met Ebert several years ago, that Ebert made statements Aindicating
that in return for his cooperation with law enforcement authorities he would
not be held criminally responsible for the harm to Stephanie Tacina,@ and
that Ebert had made Aseveral inconsistent statements
. . . regarding the level of his involvement in the [offense].@  Subsequently, the State filed a stipulation
of evidence indicating its discovery that Ebert, not Frank, obtained the brick
from the trailer park.  Frank alleges and
the State agrees, that after the State filed this stipulation of evidence the
attorneys met with the trial court judge in chambers to bring the stipulation
of evidence to her attention.  Frank=s motion
for new trial was nonetheless overruled by operation of law.








In his first issue, Frank argues that A[t]he
trial court violated Appellant=s
federal and state constitutional right to a fair trial by overruling his Motion
for New Trial.@ 
Frank does not claim that the trial court erred by denying him a hearing
on his motion for new trial.  Compare
Wallace v. State, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003) (holding that
when defendant claims error in failure to grant motion for new trial hearing,
appellate court must address that issue first). 
Frank does not claim that McKinley=s
cursory affidavit or the statements set forth therein satisfied the requisites
necessary to entitle him to a new trial based on newly discovered
evidence.  See Keeter v. State, 74
S.W.3d 31, 37 (Tex. Crim. App. 2002) (setting forth four requisites).  Instead, Frank argues that after the State
filed its stipulation of evidenceCindicating
Ebert=s
admission that in fact he, not Frank, picked up the brick at the trailer parkCthe
trial court should have granted a new trial based on newly discovered evidence.








A new trial shall be given to an accused where
material evidence favorable to the accused has been discovered since
trial.  Tex.
Code Crim. Proc. Ann. art. 40.001 (Vernon Supp. 2005).  A trial court has discretion to decide
whether to grant a new trial based upon newly discovered evidence, and its
ruling will not be reversed absent an abuse of discretion.  Keeter, 74 S.W.3d at 37.  The trial court's discretion extends to
situations in which the newly‑discovered evidence is the retraction of a
witness's testimony.  Id.  To establish an abuse of discretion in the
failure to grant a new trial based on newly discovered evidence, the appellant
must show that (1) the evidence was unknown to him before trial, (2) his
failure to discover the evidence was not due to a lack of diligence, (3) it is
probably true, and its materiality will probably bring about a different result
upon a new trial; and (4) it is competent, not merely cumulative,
corroborative, collateral, or impeaching. 
Id. at 36-37.  Motions for
new trial based upon newly discovered evidence are not favored by the courts
and are viewed with great caution.  Drew
v. State, 743 S.W.2d 207, 225 (Tex. Crim. App. 1987).








On appeal, Frank makes no effort to show that
Ebert=s
changed testimony about who picked up the brick in the trailer park would
probably bring about a different result upon a new trial.[4]  The evidence established that Frank,
Ponce-Duron, Doyle, Turner, and Ebert were together in Doyle=s
vehicle when they pulled into the trailer park and the brick was obtained.  Ebert=s false
testimony only concerned who picked up the brick.  It did not negate the evidence that Frank
nevertheless used a piece of that brick to strike Tacina on the head, causing
her serious injury.  Ebert=s
perjury also does not discount or negate the evidence that Frank participated
in the plan to kidnap Tacina from the hospital, that Frank struck Tacina with
his hands while in Doyle=s vehicle, that Frank tried to
break Tacina=s neck (or strangle her) with
her own shirt just before Ponce-Duron cut her throat, and that Frank disposed
of his bloody clothes and helped Ponce-Duron clean Tacina=s blood
out of Doyle=s vehicle.  Because the record before us does not
establish that Ebert=s new testimony would probably
bring about a different result, we hold that the trial court did not abuse its
discretion by permitting Frank=s motion
for new trial to be overruled by operation of law.[5]  See Keeter, 74 S.W.3d at 36-37.   We overrule Frank=s first
point.

IV.  Motion for Instructed Verdict

In his second point, Frank contends that the
trial court erred by denying his motion for instructed verdict.  Frank argues that the Aevidence
did not support the position that the Appellant at any point desired the death
of@ Tacina
and that the evidence was insufficient to prove that he Aintended
or participated as a party in the death of@
Tacina.  

 

 








A.  Standard of Review 

A challenge to the denial of a motion for
instructed verdict is actually a challenge to the legal sufficiency of the
evidence.  McDuff v. State, 939
S.W.2d 607, 613 (Tex. Crim. App.), cert. denied, 522 U.S. 844 (1997); Franks
v. State, 90 S.W.3d 771, 789 (Tex. App.CFort
Worth 2002, no pet.).  In reviewing the
legal sufficiency of the evidence to support a conviction, we view all the
evidence in the light most favorable to the verdict in order to determine
whether any rational trier of fact could have found the essential elements of
the crime beyond a reasonable doubt.  Jackson
v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross v.
State, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).








This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).

B.  Capital
Murder and Law of Parties

The law of parties applies to the offense of
capital murder, and a person commits capital murder if he intentionally or
knowingly causes the death of an individual and intentionally commits the
murder in the course of committing or attempting to commit, among other things,
kidnapping, obstruction, or retaliation. 
Tex. Penal Code Ann. '
19.02(b)(1) (Vernon 2003), '
19.03(a)(2) (Vernon 2003); Johnson v. State, 853 S.W.2d 527, 534 (Tex.
Crim. App. 1992), cert. denied, 510 U.S. 852 (1993).








Under the law of parties, A[a]
person is criminally responsible as a party to an offense if the offense is
committed by his own conduct, by the conduct of another for which he is
criminally responsible, or by both.@  Tex.
Penal Code Ann. ' 7.01(a) (Vernon 2003).  A person is Acriminally
responsible@ for an offense committed by the
conduct of another if, acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense.  Id.
'
7.02(a)(2).      Evidence is sufficient to
convict under the law of parties where the defendant is physically present at
the commission of the offense and encourages its commission by words or other
agreement.  Ransom v. State, 920
S.W.2d 288, 302 (Tex. Crim. App.) (op. on reh=g), cert.
denied, 519 U.S. 1030 (1996).  In
determining whether a defendant participated in an offense as a party, the fact
finder may examine the events occurring before, during, and after the
commission of the offense and may rely on actions of the defendant that show an
understanding and common design to commit the offense.  Id.; Cordova v. State, 698
S.W.2d 107, 111 (Tex. Crim. App. 1985), cert. denied, 476 U.S. 1101
(1986).  

Further, section 7.02(b) of the penal code
provides

[i]f, in the attempt to carry out a conspiracy to commit one felony,
another felony is committed by one of the conspirators, all conspirators are
guilty of the felony actually committed, though having no intent to commit it,
if the offense was committed in furtherance of the unlawful purpose and was one
that should have been anticipated as a result of the carrying out of the
conspiracy.  

 

Tex.
Penal Code Ann.
' 7.02(b).

 

The law of parties need not be pled in the
indictment, Marable v. State, 85 S.W.3d 287, 287 (Tex. Crim. App. 2002),
and circumstantial evidence may be used to prove party status.  Cordova, 698 S.W.2d at 111.   

C. 
Evidence Sufficient To Convict Under Law of Parties








Here, the court=s charge
to the jury included a charge on the law of parties following sections
7.02(a)(2) and 7.02(b) of the penal code, and the jury returned a verdict
finding Frank guilty of capital murder. 
Thus, the jury concluded either (1) that Frank intentionally promoted or
assisted in the commission of Tacina=s murder
in the course of committing or attempting to commit the offense of kidnapping,
obstruction, or retaliation or, (2) that in facilitating a conspiracy to commit
kidnapping, aggravated kidnapping, aggravated assault, obstruction, or
retaliation, Ponce-Duron intentionally caused the death of Tacina and that this
act was committed in furtherance of the conspiracy and should have been
anticipated by Frank.








Before addressing the sufficiency of the
evidence, we will address an argument that Frank appears to assert within the
context of this second point, specifically, that the trial court should have
granted his motion for instructed verdict because he did not have the intent to
kill Tacina.  To convict one of capital
murder as a party under section 7.02(a)(2), the State need only prove
that the defendant harbored the specific intent to promote or assist the
commission of an intentional murder.  Lawton
v. State, 913 S.W.2d 542, 555 (Tex. Crim. App. 1995), cert. denied,
519 U.S. 826 (1996), overruled on other grounds, Mosley v. State, 983
S.W.2d 249, 263 (Tex. Crim. App. 1998). 
The State does not have to show that the party also had the specific
intent to kill.  Likewise, section
7.02(b) expressly allows one to be convicted as a party to a felony committed
by a co-conspirator even though the accused party has no intent to commit that
felony.  Tex. Penal Code Ann. '
7.02(b); Snow v. State, 721 S.W.2d 943, 949 (Tex. App.CHouston
[1st Dist.] 1986, no pet.) (reasoning absence of intent to kill irrelevant to
conviction under law of parties). 
Because the court charged Frank under the law of parties, the State was
not required to show that he had the intent to kill Tacina.  See Andrews v. State, 744 S.W.2d 40,
51-52 (Tex. Crim. App. 1987), cert. denied, 488 U.S. 871 (1988) (A[W]e
strongly disagree with appellant=s claim
that . . . when the State is relying upon the provisions of Section 7.02(a)(2)
and (b) for a conviction for Capital Murder by complicity responsibility, one
or more of the above culpable mental states . . . must be proved by the
evidence, beyond a reasonable doubt.  As
it now stands, our statutes do not require any of these culpable mental states
to be proved . . . .@); Carmona v. State, 76
S.W.3d 29, 31-33 (Tex. App.CAmarillo
2001, pet. ref=d) (A[W]e
decline appellant=s invitation to engraft new
language onto Section 7.02(a)(2) to require that a person must have specific
intent to kill in order to be criminally responsible for actions of another in
committing murder as set out in Section 19.02(b)(2).@); see
also Springer v. State, No. 07-95-0303-CR, 1997 WL 184726, *1-2 (Tex. App.CAmarillo
April 16, 1997, no pet.) (not designated for publication); Batiste v. State,
No. 01-96-01480-CR, 1998 WL 418124, *1-2 (Tex. App.CHouston
[1st Dist.] July 23, 1998, pet. ref=d) (not
designated for publication).













Turning to his sufficiency argument, the evidence
shows that Frank, Doyle, Turner, Ponce-Duron, and Ebert were present when
Jackson, Frank=s cousin, was arrested.  All were upset about Jackson=s
arrest, and they immediately proceeded to determine which hospital Tacina had
been taken to so that Doyle could beat her up. 
On the way to the hospital, they discussed what they planned to do with
Tacina after the assault.  After learning
that Tacina would be released in about an hour, Frank accompanied Doyle,
Turner, and Ebert on a brief trip to, among other things, find a suitable
location to dump Tacina after the assault. 
Turner picked up Tacina and Ponce-Duron in Doyle=s
vehicle and stopped to let Frank, Doyle, and Ebert, who had been hiding behind
a sign, jump in.  Upon entering, Frank
struck Tacina on the head with a piece of brick and struck her with his hands
later during the drive.  All were fully
participating, and Ponce-Duron later exclaimed that they would have to kill
Tacina because they had taken it too far. 
The State presented evidence that, after finding a suitable location,
Frank ripped off Tacina=s shirt, wrapped it around her
neck, and tried to break her neck in an effort to kill her.  Unsuccessful, Ponce-Duron cut Tacina=s throat
and stabbed her multiple times in the abdomen as Frank and the others
observed.  Frank and Ponce-Duron showered
and changed clothes at Doyle=s house,
and they collected items that had blood on them and placed them in a trash bag.  Afterwards, Frank accompanied Ponce-Duron,
Doyle, Turner, and Ebert to a car wash where he and Ponce-Duron attempted to
wash and clean the blood out of Doyle=s
car.  In his conversation with Frank, not
long after the murder, Detective Barrett noticed a bandaged cut on one of Frank=s
fingers. 

After viewing all the evidence in the light most
favorable to the verdict, we conclude that a rational trier of fact could have
found, beyond a reasonable doubt, that Frank acted with the intent to promote
or assist the commission of the offense of capital murder and that Frank
encouraged, aided, or attempted to aid Ponce-Duron in the commission of the
offense.  See Jackson, 443
U.S. at 319, 99 S. Ct. at 2789. 
Accordingly, we hold that the trial court did not err  when it denied Frank=s motion
for instructed verdict.  We overrule
Frank=s second
point.

V.  Voluntariness of Oral Statement








In his fifth point, Frank argues that the trial
court violated his federal and state constitutional right to remain silent by
overruling his motion to suppress an audiotaped statement he made to police and
allowing it to be played before the jury. 
Frank argues that his statement was involuntary because the detective
taking the statement did not make an inquiry into his educational background or
IQ and did not elaborate on the Miranda[6]
warnings given.  The State maintains that Frank=s
statement was made knowingly and voluntarily.   Frank
filed a motion to suppress his audiotaped statement, and the trial court
conducted a Jackson v. Denno[7]
hearing to determine its admissibility. 
At a Jackson v. Denno hearing, the trial court is the sole fact
finder and may choose to believe or disbelieve any or all of the witnesses=
testimony.  Jackson, 378 U.S. at
276-77, 84 S. Ct. at 1780-81; Dewberry v. State, 4 S.W.3d 735, 747 (Tex.
Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We will not disturb the trial court=s
findings absent an abuse of discretion.  Alvarado
v. State, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995).  An abuse of discretion will be found only
when the trial judge=s decision was so clearly wrong
as to lie outside that zone within which reasonable persons might
disagree.  Montgomery v. State,
810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on reh=g).








The statement of an accused may be used in
evidence if it was freely and voluntarily made without compulsion or
persuasion.  Tex. Code Crim. Proc. Ann. art. 38.21 (Vernon 2005).  A confession is involuntary if circumstances
show that the defendant=s will was Aoverborne@ by
police coercion.  Creager v. State,
952 S.W.2d 852, 856 (Tex. Crim. App. 1997). 
In other words, a statement is involuntary if the record reflects Aofficial,
coercive conduct of such a nature@ that
any statement obtained thereby is Aunlikely
to have been the product of an essentially free and unconstrained choice by its
maker.@  Alvarado, 912 S.W.2d at 211.  The determination of whether a confession is
voluntary is based on an examination of the totality of the circumstances
surrounding its acquisition.  Reed v.
State, 59 S.W.3d 278, 281 (Tex. App.CFort
Worth 2001, pet. ref=d).








Detective Barrett testified at the hearing that
he arrested Frank pursuant to a warrant on September 18, 2002.  Detective Barrett took Frank to the
Lewisville Police Department and asked him if he would like to give a
statement.  He agreed to give one, and he
was taken to an interview room where Detective Barrett audio recorded the
interview.[8]  At the outset of the interview, Detective
Barrett read Frank the Miranda warnings. 
Detective Barrett testified that Frank never indicated that he wanted to
take a break during the interview and that he never invoked any of the rights
explained to him.  Detective Barrett
testified that Frank understood each and every right and that he still wanted
to proceed with the interview.  The Texas
Code of Criminal Procedure only requires that an accused be Agiven
the warning in Subsection (a) of Section 2 above and the
accused knowingly, intelligently, and voluntarily waives any rights set out in
the warning.@ 
Tex. Code Crim. Proc. Ann.
art. 38.22, ' 3(a)(2) (Vernon 2005) (emphasis
added).  Accordingly, the evidence shows
that, based on the totality of the circumstances, Frank=s statement
was made knowingly and voluntarily. 
Nothing in the record indicates that Frank is mentally impaired or has a
low IQ.  The evidence supports the trial
court=s
ruling.  We hold that the trial court did
not abuse its discretion by denying Frank=s motion
to suppress.  We overrule Frank=s fifth
point.

VI.  VideotapeCHearsay








In his third point, Frank argues that the trial
court violated his federal and State right to a fair trial by excluding a
videotape of statements by Doyle Athat
exonerated and proved@ his innocence.  Frank contends that the videotape was
admissible as an exception to the hearsay rule pursuant to Texas Rule of
Evidence 803(24)Ca statement against penal
interest.  The State argues that the
trial court properly excluded the videotape as inadmissible hearsay.   We review a trial court=s
decision to admit or exclude evidence of a statement against penal interest for
an abuse of discretion.  James v.
State, 102 S.W.3d 162, 176 (Tex. App.CFort
Worth 2003, pet. ref=d).  The trial court=s ruling
will not be reversed as long as it is within the Azone of
reasonable disagreement.@ 
Montgomery, 810 S.W.2d at 379-80; Couchman v. State, 3
S.W.3d 155, 158 (Tex. App.CFort
Worth 1999, pet. ref=d).

Hearsay is a statement, other than one made by
the declarant while testifying at the trial or hearing, offered in evidence to
prove the truth of the matter asserted.  Tex. R. Evid. 801(d).  Rule 803 lists a number of hearsay
exceptions, and rule 803(24) provides in relevant part as follows:

Statement Against
Interest.  A statement which . . . at the time of its
making . . . so far tended to subject the declarant to . . . criminal liability
. . . that a reasonable person in declarant=s position would not have made the statement
unless believing it to be true.  In
criminal cases, a statement tending to expose the declarant to criminal
liability is not admissible unless corroborating circumstances clearly indicate
the trustworthiness of the statement.  

 

Tex. R. Evid. 803(24).  Whether a statement is admissible in
accordance with rule 803(24) requires a two-step inquiry.  Bingham v. State, 987 S.W.2d 54, 57
(Tex. Crim. App. 1999).  First, the trial
court must determine whether the statement in question tends to expose the
declarant to criminal liability.  Id.  Second, the trial court must determine
whether there are corroborating circumstances that clearly indicate the
trustworthiness of the statement.  Id.  The party seeking admission of the statement
has the burden to make this showing.  James,
102 S.W.3d at 176.








In the instant case, the videotape offered into
evidence by Frank was made by Sherika Modester, a friend of Doyle=s, with
the help of David Johnson at Modester=s
apartment on July 22, 2003.  After the
murder, Doyle evidently made a number of statements to Modester concerning
Frank=s
involvement, or lack thereof, in the murder of Tacina.  Concerned about Frank=s
pending legal situation, Modester and Johnson decided to set up a video
recorder and to attempt to record Doyle making these statements.  The tape shows Doyle and Modester having a
conversation.   








We have reviewed the videotape, and a large
portion of the conversation between Doyle and Modester is unintelligible
because of loud background noise from a television.[9]  We were, however, able to understand Doyle
say that (Ponce-Duron) was the only one who did anything to Tacina and that
she, Frank, Turner, and Ebert did not do anything to Tacina.  Doyle also questions why Ebert was charged
with aggravated assault while she, Frank, and Turner were charged with capital
murder.  We further understand Doyle to
be discussing probation and capital murder in some context.  As the State points out, Doyle=s
statements could be construed as placing her at the murder scene, but admitting
presence at the scene is not necessarily against Doyle=s penal
interest because mere presence at the scene of the offense, by itself, is
insufficient to support criminal responsibility as a party.  Felters v. State, 147 S.W.3d 488,
490-91 (Tex. App.CFort Worth 2004, pet. ref=d).  We cannot agree with Frank=s
contention that Doyle admitted her participation in Tacina=s murder
on the videotape.  To the contrary, she
said she did not do anything to Tacina. 
If Doyle admitted responsibility, we were unable to understand it.  Based on the videotape, we conclude that
Doyle=s
statements do not tend to expose her to criminal liability.  See Bingham, 987 S.W.2d at 57.[10]  Accordingly, because the understandable
portions of the videotape contain only statements not falling under any
recognized exception to the hearsay rule, the trial court did not abuse its
discretion by excluding the videotape.  Tex. R. Evid. 802, 803.  We overrule Frank=s third
point.

VII. photographs








In his fourth point, Frank argues that he was
denied his right to a fair trial because the trial court admitted Ainflammatory
and prejudicial@ crime scene and autopsy
photographs of Tacina.  Frank contends
that the cumulative effect of the Agrotesque
images@
outweighed any probative value they may have had.[11]
   The admissibility of a photograph is
within the sound discretion of the trial judge. 
Paredes v. State, 129 S.W.3d 530, 539 (Tex. Crim. App.
2004).  We will not disturb a trial court=s ruling
admitting or excluding evidence so long as its decision falls within the Azone of
reasonable disagreement.@ 
See Montgomery, 810 S.W.2d at 391.








Under Texas Rule of Evidence 403, relevant
evidence may be excluded if its probative value is substantially outweighed by
the danger of unfair prejudice.  Tex. R. Evid. 403.  A rule 403 analysis by the trial court should
include, but is not limited to, the following considerations: (1) the probative
value of the evidence; (2) the potential to impress the jury in some
irrational, yet indelible, way; (3) the time needed to develop the evidence;
and (4) the proponent=s need for the evidence.  Erazo v. State, 144 S.W.3d 487, 489
(Tex. Crim. App. 2004).  A court may
consider the following factors in determining whether the probative value of a
photograph is substantially outweighed by the danger of unfair prejudice: the number
of photographs, the size of the photograph, whether they are in color or black
and white, whether they are gruesome, whether the body is naked or clothed, and
whether the body has been altered by autopsy. 
Reese v. State, 33 S.W.3d 238, 241 (Tex. Crim. App. 2000).

Autopsy photographs are generally admissible
unless they depict mutilation caused by the autopsy itself.  Rayford v. State, 125 S.W.3d 521, 529
(Tex. Crim. App. 2003), cert. denied, 125 S. Ct. 39 (2004).  Where pictorial evidence will help the jury
to understand verbal testimony, such as the technical language used by a
medical doctor in describing the injuries sustained by a victim of a crime, the
photograph is generally admissible.  Harris
v. State, 661 S.W.2d 106, 107 (Tex. Crim. App. 1983).  Photographs that depict the nature, location,
and extent of a wound have been declared probative enough to outweigh any
prejudicial effect.  Legate v. State,
52 S.W.3d 797, 807 (Tex. App.CSan
Antonio 2001, pet. ref=d).  Overall, the photograph must be helpful to
the jury; A[i]f there are elements of a
photograph that are genuinely helpful to the jury in making its decision, the
photograph is inadmissible only if the emotional and prejudicial aspects
substantially outweigh the helpful aspects.@  Erazo, 144 S.W.3d at 491-92.

A.  Crime
Scene Photographs








States=
Exhibits 13 through 21 depict the crime scene. 
They were published to the jury using APower
Point.@  Exhibits 13, 14, and 15 were taken from a
distance and show the area surrounding Tacina=s
body.  Detective Barrett testified that
Tacina was found in a vacant lot between a housing development and a trailer
park, and Ebert described the location that was chosen to murder Tacina and
dump her body as an Aexcluded area@ with a Alittle
dirt mound.@ 
Accordingly, the photographs were helpful to the jury because they
provided a visual context for Detective Barrett=s and
Ebert=s
testimony describing the crime scene. 
Moreover, Tacina=s injuries are not visible in
any of the photographs.








Exhibits 16, 17, and 18 depict Tacina=s entire
body; she is lying on her back, wearing only a pair of shorts and tennis
shoes.  Each photograph is taken from a
different angle, and each photograph is in color.  None of Tacina=s wounds
are visible in exhibit 16, but the stab wounds to her stomach are visible in
exhibit 17, and the injury to her throat is visible in exhibit 18.  Exhibits 19, 20, and 21 are close-ups
focusing on the injuries themselves.  The
trial court admitted the photographs and published them to the jury after
Detective Barrett testified regarding where and how Tacina was found; the State
did not spend a substantial amount of time discussing the photographs.  The probative value of the photographs is
high.  They provide strong visual
evidence corroborating the testimony of Ebert, Detective Barrett, and a portion
of Hoffman=s testimony concerning how
Tacina was murdered, the injuries inflicted, and the ultimate result of the
events that took place on September 15, 2002. 
Moreover, the State=s need
for the evidence was relatively high.  As
the State points out, the only other evidence it had to establish the
circumstances surrounding Tacina=s murder
came primarily from Ebert and Hoffman, one of whom participated in the events
leading up to and after the murder.  As
the court of criminal appeals has stated, AVisual
evidence accompanying testimony is most persuasive and often gives the fact
finder a point of comparison against which to test the credibility of a witness
and the validity of his conclusions.@  Chamberlain v. State, 998 S.W.2d 230,
237 (Tex. Crim. App. 1999), cert. denied, 528 U.S. 1082 (2000).  Thus, although the photographs arguably
depict Adisagreeable
realities,@ Athey
depict nothing more than the reality of the brutal crime committed@ and
helped the jury to understand the verbal testimony.  Id. 
We hold that the probative value of State=s
Exhibits 13 through 21 is not substantially outweighed by its prejudicial
effect.  See Tex. R. Evid. 403.  Thus, the trial court did not abuse its
discretion by admitting State=s
Exhibits 13, 14, 15, 16, 17, 18, 19, 20, and 21.  See Paredes, 129 S.W.3d at 539. 

B.  Autopsy
Photographs








State=s
Exhibits 43 through 58 are autopsy photographs of Tacina introduced and
admitted during the testimony of Gary L. Sisler, M.D., the medical examiner who
performed Tacina=s autopsy.  Like the crime scene photographs, they were
published to the jury using APower
Point.@  All of the photographs are in color, and each
one depicts an injury or different view of an injury suffered by Tacina.[12]  Before the photographs were admitted, Dr.
Sisler affirmed that the photographs would assist him in his testimony
concerning Tacina=s injuries and would also help
the jury understand his testimony.  Dr.
Sisler testified that Tacina=s manner
of death was homicide and that the cause of death was multiple sharp force
injuries.  He further testified
concerning the extent of the injuries suffered, how they were inflicted, and
when they likely occurred in relation to Tacina=s
death.  The photographs do not depict
mutilation caused by the autopsy, but the nature, location, and extent of the
wounds as testified to by Dr. Sisler. The photographs thus had the effect of
illustrating Dr. Sisler=s testimony.  Accordingly, we hold that the probative value
of State=s
Exhibits 43 through 58 is not substantially outweighed by their prejudicial
effect, if any.  See Tex. R. Evid. 403.  Thus, the trial court did not abuse its
discretion by admitting State=s
Exhibits 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, and
58.  See Paredes, 129 S.W.3d at
539.  We overrule Frank=s fourth
point.

 








VIII.  Jury InstructionCReasonable
Doubt

In his sixth point, Frank argues that the trial
court erred by including the following language in its charge to the jury: AIt is
not required that the prosecution prove guilt beyond all possible doubt; it is
required that the prosecution=s proof
excludes all >reasonable doubt=
concerning the defendant=s guilt.@  Frank argues that it was error to instruct
the jury on the definition of reasonable doubt in light of Paulson v. State,
28 S.W.3d 570 (Tex. Crim. App. 2000), and that the instruction Aamounted
to a misstatement of law and contradicted the prohibition of defining
reasonable doubt as required by the Court of Criminal Appeals.@ 

We have previously addressed the propriety of
including this portion of the Geesa[13]
instruction in the jury charge and have found it to be proper.  See Pope v. State, 161 S.W.3d 114, 125
(Tex. App.CFort Worth 2004, no pet.); Best
v. State, 118 S.W.3d 857, 865 (Tex. App.CFort
Worth 2003, no pet.); see also Woods v. State, 152 S.W.3d 105, 115 (Tex.
Crim. App. 2004), cert. denied, 125 S. Ct. 2295 (2005).  Accordingly, we overrule Frank=s sixth
point.

 

 








IX.  Conclusion

Having overruled all six of Frank=s
points, we affirm the trial court=s
judgment.    

 

SUE
WALKER

JUSTICE

 

PANEL A:   LIVINGSTON, DAUPHINOT, and WALKER, JJ.

 

DAUPHINOT, J. filed a
dissenting opinion.

 

PUBLISH

 

DELIVERED: December
22, 2005











 
 
 
 
 
 
 




 

 

 

 

 

 

                                                COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                 FORT
WORTH

 

 

                                        NO.
2-04-069-CR

 

 

KESEY
DARNELL FRANK                                                       APPELLANT

 

                                                   V.

 

THE
STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM THE 367TH
DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                   DISSENTING OPINION

 

                                              ------------

Because the majority does not examine the effects
of the State=s primary witness=s
admitted perjury, I must respectfully dissent.








It is undisputed that Ebert, not Appellant,
obtained the brick used to assault the complainant.  Ebert picked up the brick and put it on the
floorboard of the car before leaving for the hospital where they planned to
kidnap the complainant.  This action
shows Ebert=s intent to use a weapon, his
degree of complicity, and his independent planning.  Ebert lied at trial about who picked up the
brick and about his level of involvement in the offense.  Indeed, his trial testimony suggested that he
was merely present when the murder was committed.

Yet the majority dismisses Appellant=s
complaint that the trial court abused its discretion by denying his motion for
new trial with the observation that AOn
appeal, [Appellant] makes no effort to show that Ebert=s
changed testimony about who picked up the brick in the trailer park would
probably bring about a different result upon a new trial.@[14]  The majority relies on case law that is, at
best, confusing.  








As the Texas Court of Criminal Appeals recognized
in Keeter, AArticle 40.001[[15]]
. . . provides:  >A new
trial shall be granted an accused where material evidence favorable to the
accused has been discovered since trial.=@[16]  Shall, of course, is mandatory, not
precatory.[17]  The Keeter court determined that the
term Amaterial@ was
ambiguous and turned to extratextual factors to interpret the legislature=s
attempt to clarify the mandate that the trial court must grant a new trial when
newly discovered evidence favorable to the accused was the basis of a motion
for new trial.[18]  In interpreting the term Amaterial,@ the Keeter
court decided that the new statute was merely a clarification of the former
appellate rule governing the same subject matter.[19]  Consequently, the Keeter court
announced that it would interpret the new statute in conformity with prior
caselaw and continue to adhere to the four‑part test that the majority in
the case before us now applies.[20]  According to the Keeter court,
materiality in the context of newly discovered evidence includes the
requirements that 

(1) the newly discovered
evidence was unknown or unavailable to the movant at the time of his trial;

 

(2) the movant=s failure to discover or obtain the evidence was
not due to a lack of diligence;        

 

(3) the new evidence is
admissible and is not merely cumulative, corroborative, collateral, or
impeaching;  and,

 

(4) the new evidence is
probably true and will probably bring about a different result on another
trial.[21]  








Given the clear wording of the statute, the
disparate treatment by the Texas Court of Criminal Appeals of materiality in
other contexts, and this court=s burden
of assessing harm, it is difficult for me to conclude that the Keeter
materiality test requires the defendant to satisfy all four prongs of
the Court=s test.  To harmonize the Keeter line with
conflicting case law and the plain wording of the statute, it would appear to
me that the four-pronged test for determining materiality is to be treated as a
guide to interpreting the statute, not as a replacement for the statute.








According to the majority opinion, it is
Appellant=s burden to show that the newly
discovered evidence is probably true and that its materiality will probably
bring about a different result upon a new trial.[22]  Although couched in terms of demonstrating
materiality on appeal, the substance of the issue in the case before us is
whether Appellant can show that he was harmed by the jury=s
reaching a verdict it would not have reached had not the State=s
eyewitness proffered perjured testimony concerning his role, and Appellant=s role,
in the commission of the murder.  As a
result, the majority, in following Keeter, would require Appellant to
show that Ebert=s perjured testimony harmed
him.  But the Texas Court of Criminal
Appeals has repeatedly reminded the intermediate appellate courts that Aneither
the State nor appellant must demonstrate harm when an error has occurred.  Rather, it is the appellate court=s duty
to assess harm after a proper review of the record.@[23]

The materiality of the new evidence in this case
is self-evident:  How much more material
could evidence of a murder be than the identity of the person who provided the
murder weapon intending that it be used to commit the murder?  Similarly, the harm is self-evident:  Conviction based on perjured testimony is per
se a denial of due process.[24]  Yet, the fourth prong of the test approved by
the Keeter court and applied by the majority appears, in a literal
sense, to require that the movant prove harm in the same way that a defendant
bears the burden of proving an affirmative defense.  The Shutz court stated,

We have explained that,
in evaluating the harm that a defendant has suffered as a result of a trial
court=s error, [w]e do not
resolve the issue by asking whether the appellant met a burden of proof to
persuade us that he suffered some actual harm. 
No party should have a burden to prove harm from an error, and there
ordinarily is no way to prove Aactual@ harm. 
Burdens and requirements of proving actual facts are appropriate in the
law of evidence, but they have little meaning for the harmless error decision.[25]  

 








What burden does a movant for new trial under
Article 40.001 have?  Surely it cannot be
greater than the burden imposed on an applicant seeking extraordinary relief.  In Ex parte Richardson, the Texas
Court of Criminal Appeals clearly set out the burden of an applicant seeking
postconviction habeas corpus relief based on a Brady violation:

Applicant must first show
that the State failed to disclose evidence, regardless of the prosecution=s good or bad faith.  He must then show that the withheld evidence
is favorable to applicant.  Finally, the
applicant must show that the evidence is material, that is, there is a
reasonable probability that had the evidence been disclosed, the outcome of the
trial would have been different.  As in
any habeas proceeding, the applicant must prove the constitutional violation
and his entitlement to habeas relief by a preponderance of the evidence.[26]

 








Like the case before us, Richardson also
dealt with perjured testimony.  The only
difference between Richardson and the case now before this court is the
timing of the complaints:  Richardson=s
complaint was brought in a post-conviction application for writ of habeas
corpus, and Appellant=s complaint was brought in a
motion for new trial. The Richardson court required only that Richardson
provide a sufficient record to show he was entitled to relief, not that he
argue the point so convincingly that he sway the appellate court.  That is, Richardson had the burden of
production, not persuasion.  In Richardson,
the Texas Court of Criminal Appeals performed this analysis:

Lastly, applicant must
show that the evidence is material, that is, there is a reasonable probability
that had the evidence been disclosed, the outcome of the trial would have been
different.  Applicant=s habeas hearing spanned
fifteen full days and included testimony from forty‑five witnesses.  Among his many factual findings regarding
applicant=s claims, the habeas
trial judge  determined that A[t]here [was] no question
but that by the time of applicant=s trial Anita Hanson=s credibility was a major
issue in the case.@  The habeas trial judge heard extensive
testimony regarding Anita Hanson=s credibility (or lack thereof), the State=s knowledge of her
credibility problems, the circumstances of her year secreted away in protective
custody, and whether Hanson had agreed to testify against applicant in return
for the District Attorney=s explicit or implicit
promise not to prosecute her for killing Napoleon Ellis.

 








Anita Hanson=s eyewitness testimony
clearly was crucial to the State=s capital murder case against applicant.  Her account placed applicant at the murder
scene at the time of the killings and assigned primary responsibility for the
murders to applicant, whom Hanson claimed was in charge and ordered Hanson to
shoot Ellison.  She was the only
eyewitness who testified to the actual killings and applicant=s participation.  The State=s other witnesses established only that (i)
appellant possessed a motive to commit the murders and intended to act on that
motive, and (ii) two witnesses had observed him firing a machine gun on some
prior date.  It was upon her testimony
that the jury convicted applicant of capital murder and sentenced him to
death.  Applicant=s co‑defendants,
however, who were tried separately, were either acquitted or their indictments
were dismissed as, over time, Anita Hanson=s credibility was fatally impeached by her ever‑increasing
number of self‑admitted perjurious statements.  Her story unraveled entirely in subsequent
trials.  We find that applicant has
demonstrated a reasonable probability that, had the Goldston diary been timely
disclosed and the six law enforcement officers testified, Anita Hanson=s credibility would have
not only been impeached, but severely undermined.  Because her testimony was critical to the
State=s case, we agree with the
habeas judge who concluded: AI find as a matter of law that the evidence
would, in all likelihood, create the probability sufficient to undermine the
confidence in the outcome of the proceeding.@[27]

 

In Ex parte Adams,[28]
the Texas Court of Criminal Appeals addressed specifically the question of
perjured testimony and the materiality requirement:

In Giglio v. United
States, the Supreme Court decided that evidence of a promise of leniency to
a witness made by another prosecutor should have been disclosed to the defense
even if the prosecutor trying the case acted in good faith and did not know of
the offer because a Apromise made by one
attorney must be attributed to the Government.@  Accordingly, the Court concluded that the
government=s failure to disclose the
impeachment evidence was a violation of due process.  In addition, the Court articulated a standard
for materiality, left unexplained in Brady, by stating that Aif >the false testimony could
... in any reasonable likelihood have affected the judgment of the jury,=@ then it was sufficiently
material to require a new trial.

 

In United States v. Agurs, the Court established several
different standards of materiality. 
First, in cases where the prosecution knew or should have known that
perjured testimony was utilized to secure a conviction then materiality would
be present and a new trial ordered Aif there is any reasonable likelihood that the
false testimony could have affected the judgment of the jury.@  The Court believed that such a standard was
appropriate because such cases Ainvolve a corruption of the truth‑seeking
function of the trial process.@

 








Second, the Court observed that if the defense makes a specific
pretrial request for exculpatory evidence and the prosecutor is thereby placed
on notice his Afailure to make any
response is seldom, if ever, excusable.@  Although
the Court did not expressly identify a standard of materiality it is obvious
that it intended to apply the Amay have affected the trial outcome@ standard.

 

Third, in those cases in which the defendant makes either no request
or an overly general request, although the prosecutor will still have a duty to
disclose favorable evidence, the standard of materiality will necessarily be
higher than in the preceding situations. 
The Court stated:

 

If the omitted evidence
creates a reasonable doubt that did not otherwise exist, constitutional error
has been committed.  This means that the
omission must be evaluated in the context of the entire record.  If there is no reasonable doubt whether or
not the additional evidence is considered, there is no justification for a new
trial.

 








In 1985 the Supreme Court again confronted the issue of the prosecutor=s failure to disclose to
the defendant favorable evidence.  In United
States v. Bagley, a divided Court replaced the Brady‑  Agurs multiple materiality standards and
adopted a single materiality standard. 
In doing so, the Court rejected the distinctions between specific
requests for exculpatory evidence and no requests for such evidence.  In Bagley the defendant was indicted
for violating Federal narcotics and firearm statutes.  Prior to trial the defendant filed a
discovery motion requesting that the trial court order the government to
disclose A>any deals, promises or
inducements made to witnesses in exchange for their testimony.=@ The government=s response to the
defendant=s discovery motion did
not disclose any A>deals, promises or
inducements.=@  Several years after the defendant was
convicted, he discovered that the government=s only witnesses had executed contracts to
provide to the Bureau of Alcohol, Tobacco and Firearms information concerning
his activities, collect evidence against him and testify against him in
court.  The witnesses were to be paid an
amount of money Aupon the accomplishment
of the objective . . . .@

 

The Supreme Court noted initially that the rule of Brady v.
Maryland was based on the requirement of due process, and its overriding
purpose was to insure that a defendant receives a fair trial by requiring the
prosecution to disclose favorable evidence. 
The Court further noted that unlike Brady and Agurs the
case involved impeachment evidence but it too was subject to the  Brady dictates and should not be
distinguished from any other exculpatory evidence.

 

The Court thereafter reviewed its holding in Agurs and the
standards of materiality it established. 
The Court also noted that since Agurs, the Court had decided Strickland
v. Washington, which held:

 

[t]hat a new trial must
be granted when evidence is not introduced because of the incompetence of
counsel only if Athere is a reasonable
probability that, but for counsel=s unprofessional errors, the result of the
proceeding would have been different.@  The  Strickland Court defined a Areasonable probability@ as Aa probability sufficient
to undermine confidence in the outcome.@

 

The Court then dispensed with the Agurs standards of
materiality that distinguished between Ano request,@ Ageneral request,@ and Aspecific request@ cases and concluded that
the standard identified in Strickland v. Washington would be Asufficiently flexible to
cover all of the preceding situations.@

 

Significantly, however, the majority opinion did not disturb the
standard of materiality announced in Agurs for cases involving the
prosecution=s knowing utilization of
perjurious testimony.

 








In  Ex parte Turner, this
Court adopted the Agurs test for materiality in both specific request
and no request cases.  Implicitly, the
Court adopted the Agurs standard of materiality when perjured testimony
is utilized.

 

In  Hernandez v. State,
we adopted the Strickland v. Washington standard to resolve claims of
ineffective assistance of counsel.  We
are now equally persuaded by the reasoning of the Supreme Court in Bagley
when it adopted the Strickland standard for materiality in cases
involving exculpatory evidence.  Since
the  Bagley Court did not disturb
the standard of materiality established in Agurs when dealing with the
prosecution=s knowing use of perjured
testimony we hereby expressly adopt that standard also.

 

Comparing these standards to the trial court=s findings it is obvious
that habeas corpus relief is necessary. 
The statement Miller gave to the police on December 3, 1976, which the
trial court found the State intentionally failed to disclose, contains
statements that are the diametric opposite of Miller=s trial testimony.  During the writ hearing the applicant=s attorney introduced,
without objection, an exhibit that details the abundant discrepancies between
the two statements.  Obviously, this is
the type of prior inconsistent statement that could have had the effect of
substantially soiling Miller=s direct identification testimony.  In  Napue
v. Illinois, the Supreme Court observed that the State=s principal identification
witness had, contrary to his trial testimony, been offered something in
exchange for his testimony.  In finding
that the prosecutor had a duty to correct the perjured testimony the Court
commented, AThe jury=s estimate of the
truthfulness and reliability of a given witness may well be determinative of
guilt or innocence.@  Had Miller=s statement been provided to the defense, as the
trial court had ordered, it would have obviously constituted a secure basis for
impeachment and could have nullified the effect of her otherwise unimpeached
identification of the applicant.[29]

 








The majority in the case now before this court
does not analyze the importance of the newly discovered evidence that Ebert
committed perjury in describing his role in the murder.  Rather, the majority assigns to Appellant a
burden of persuasion that does not clearly and unequivocally exist in the law
that governs this issue.  Instead of
examining the record to determine the impact of Ebert=s
perjury, the majority requires Appellant to convince us that he would have been
acquitted if Ebert had testified truthfully.








The majority does not consider the effect that
truthful testimony would have had on the jury charge or upon the sufficiency of
the evidence.  That is, the majority does
not consider that the revealed perjury shows that Ebert is, like the other
eyewitnesses, an accomplice.  A person
who is merely present at the scene of the offense is not an accomplice; an
affirmative act or omission is required.[30]  A defendant is not entitled to a jury
instruction on the accomplice witness rule if another person was merely present
at the scene of the offense.[31]
When the evidence shows that a witness is a party to the offense for which a
defendant is being tried, however, the defendant is entitled to a jury
instruction that tells the jury that A[a]
conviction cannot be had upon the testimony of an accomplice unless
corroborated by other evidence tending to connect the defendant with the
offense committed; and the corroboration is not sufficient if it merely shows
the commission of the offense.@[32]  The corroboration cannot come from another
accomplice who testifies in court.[33]

Ebert=s
perjured testimony portrayed him as an innocent bystander, merely present at
the murder scene.  Appellant did not
request an accomplice witness instruction as to Ebert, and, if Ebert was merely
present, Appellant was not entitled to the jury instruction.[34]  I would point out that the evidence at trial
showed that the other eyewitnesses to the murder were also participants.  As Judge Womack observed in Herron, A[I]f
there was no charge at all on the law of accomplice‑witnesses, there is
no chance that the jury could have applied the law correctly.@[35]








The majority does not discuss the impact of Ebert=s
perjury on Appellant=s ability to convince the trial
court that Ebert was an accomplice as a matter of law or to convince the jury that
Ebert was an accomplice as a matter of fact. 
The majority does not discuss the effect of a jury instruction on
accomplice testimony.  Nor does the
majority discuss the impact of independent impulse evidence.[36]  Of equal significance in determining whether
Appellant should have been granted a new trial, the majority does not evaluate
the condition of the remaining evidence when all accomplice testimony is
excluded.[37]

Perjury undermines the very fabric of our justice
system.  Our rule of law depends on
honesty:  on honest judges, on honorable
counsel, and on witnesses who are governed by the sanctity of the oath they
swear or affirm.  When any element of
this rule of law fails its obligation of honesty, both the State and the
defendant are denied a fair trial, and the public is denied a belief in the
integrity of our justice system.  Both
the trial judge and the lawyers in this case behaved honorably; it is the
witness Ebert who violated his oath. 
Because the majority fails to assess the impact that Ebert=s lies
had on Appellant=s right to a fair trial, I am
compelled to dissent.

 

LEE
ANN DAUPHINOT

JUSTICE

 

PUBLISH











[1]Jackson had been Aseeing@ Tacina. 





[2]Jackson is the father of
Doyle=s son and the cousin of
Frank. 





[3]Ebert testified at trial
that Frank picked up the brick in the trailer park, but after trial Ebert
admitted that he picked up the brick in the trailer park; the State filed a
stipulation of evidence disclosing this information.  





[4]Because the meeting with
the judge concerning Ebert=s new testimony that he, not Frank, picked up the
brick occurred in chambers, we have no idea whether Frank attempted in this
meeting to meet his burden of establishing that this change in one aspect of
Ebert=s testimony would
probably bring about a different result.





[5]The issues addressed by
the dissent were not raised by Frank either in the trial court or in this
court.  Frank nowhere claims that Ebert
was an accomplice witness as a matter of law or fact; Frank nowhere asserts
that he was entitled to a jury instruction on the accomplice witness rule;
Frank nowhere asserts that the court=s charge was erroneous in any respect.  Because these issues were not raised by
Frank, they could not in any event result in the reversal of his
conviction.  See Gerron v. State,
97 S.W.3d 597 (Tex. Crim. App. 2003) (prohibiting court of appeals from
reversing conviction on unassigned error); Hailey v. State, 87 S.W.3d
118, 121‑22 (Tex. Crim. App. 2002) (same), cert. denied, 538 U.S.
1060 (2003).  Additionally, the dissent
confuses error and harm; it is Frank=s burden to establish error in the failure
to grant a new trial because newly discovered evidence would probably bring
about a different result.  See Keeter,
74 S.W.3d at 36-37.  





[6]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct.
1602 (1966).





[7]378 U.S. 368, 84 S. Ct.
1774 (1964)





[8]Detective Barrett brought
Frank a Coke and some chips just before the interview began. 





[9]The record does not
contain a transcription of the taped conversation.





[10]We need not address
whether there are corroborating circumstances that clearly indicate the
trustworthiness of the statements because the first inquiry fails.  Bingham, 987 S.W.2d at 57. 





[11]Frank did not argue at
trial, and he does not argue on appeal, that the photographs were not
relevant.  We therefore presume that the
photographs are relevant.  





[12]Dr. Sisler testified,
however, that some of the Ayellowish, almost parchment-like@ area on State=s Exhibit 47 resulted from
insect activity. 





[13]Geesa v. State, 820 S.W.2d 154 (Tex.
Crim. App. 1991).





[14]Majority op. at 9. 





[15]Tex.
Code Crim. Proc. Ann. art. 40.001 (Vernon Supp. 2005).





[16]Keeter v. State, 74 S.W.3d 31, 36 (Tex.
Crim. App. 2002).





[17]See Tex.
Gov=t Code Ann. ' 311.016(2) (Vernon
2005); see also Albertson's, Inc. v. Sinclair, 984 S.W.2d 958, 961 (Tex.
1999) (AWe generally construe the
word >shall= as mandatory, unless
legislative intent suggests otherwise.@).





[18]Keeter, 74 S.W.3d at 36.





[19]Id. at 37.





[20]Id.





[21]Id. at 36-37.





[22]See majority op. at 9.





[23]Schutz v. State, 63 S.W.3d 442, 444
(Tex. Crim. App. 2001) (citations omitted).





[24]Ex parte Castellano, 863 S.W.2d 476, 481
(Tex. Crim. App. 1993).





[25]Shutz, 63 S.W.3d at 444
(citations omitted).





[26]Ex parte Richardson, 70 S.W.3d 865, 870
(Tex. Crim. App. 2002) (citations omitted).





[27]Id. at 872-73 (citations
omitted).





[28]768 S.W.2d 281 (Tex. Crim. App. 1989).





[29]Id. at 289-91 (citations and
footnotes omitted).





[30]Blake v. State, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998).





[31]Russell v. State, 598 S.W.2d 238, 250
(Tex. Crim. App.), cert. denied, 449 U.S. 1003 (1980).





[32]Tex.
Code Crim. Proc. Ann. art. 38.14 (Vernon 2005).





[33]See Herron v. State, 86 S.W.3d 621, 631-33
(Tex. Crim. App. 2002).





[34]See Russell, 598 S.W.2d at 250.





[35]Herron, 86 S.W.3d at 635
(Womack, J. dissenting).





[36]See Solomon v. State, 49 S.W.3d 356, 368 (Tex.
Crim. App. 2001) (pointing out that there is no enumerated defense of @independent impulse@ in the penal code but
that independent impulse evidence would Asimply negate the conspiracy liability element of
the State's case@).





[37]See Tex.
Code Crim. Proc. Ann. arts. 38.14, 38.17 (Vernon 2005).